**ORAL ARGUMENT NOT YET SCHEDULED**

No. 22-5221

Iɴ ᴛʜᴇ

# 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 𝔆𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰 𝔉𝔬𝔯 𝔱𝔥𝔢 𝔇𝔦𝔰𝔱𝔯𝔦𝔠𝔱 𝔬𝔣 𝔆𝔬𝔩𝔲𝔪𝔟𝔦𝔞 𝔆𝔦𝔯𝔠𝔲𝔦𝔱

ELIZABETH SCHACHT, M.D.,

*Appellant,*

v.

STEVEN L. LIEBERMAN, in his official capacity
as Acting Principal Under Secretary for Health,
Department of Veterans Affairs, Veterans Health Administration, *et al.*,

*Appellees.*

**On Appeal from the United States District Court
for the District of Columbia
No. 1:20-cv-2148
Hon. Christopher R. Cooper**

**BRIEF FOR APPELLANT ELIZABETH SCHACHT, M.D.**

Brandon L. Arnold
Mark H. Russell
Kʀᴀᴍᴇʀ Lᴇᴠɪɴ Nᴀғᴛᴀʟɪs &
Fʀᴀɴᴋᴇʟ LLP
2000 K Street NW, 4th Floor
Washington, DC 20006
Telephone: 202.471.3043
Facsimile: 202.775.4510
Barnold@Kramerlevin.com

*Counsel for Appellant
Elizabeth Schacht, M.D.*

April 20, 2023

On behalf of appellant, undersigned counsel certifies as follows:

**A. Parties and Amici**

The following were parties in the district court and are parties in this Court:

<u>Plaintiff-Appellant</u>:  Elizabeth Schacht.

<u>Defendant-Appellees</u>:  Steven L. Lieberman, in his official capacity as Acting Principal Under Secretary for Health, Department of Veterans Affairs, Veterans Health Administration; the Disciplinary Appeals Board; and the Eastern Colorado Healthcare System.

<u>Amici and Intervenors</u>:  None.

**B. Rulings Under Review**

This appeal concerns two orders of the U.S. District Court for the District of Columbia, which resolved the parties' cross-motions for summary judgment.

By order dated September 22, 2021, the district court granted in part and denied in part Dr. Schacht's motion for summary judgment and remanded to the Board for a further explanation of its unexplained evidentiary exclusions.  *See* JA1 (order); JA2-28 (memorandum opinion).  The district court's memorandum opinion is also available at *Doe v. Lieberman*, 2021 WL 4476748 (D.D.C. Sept. 30, 2021).

After the Board issued its new explanation, the district court granted summary judgment to Defendants on all remaining issues by order dated August 10, 2022.  *See* JA31-32 (order); JA33-67 (memorandum opinion).   The district court's second

memorandum opinion is also available at *Doe v. Lieberman*, 2022 WL 3576211 (D.D.C. Aug. 11, 2022).

**C. Related Cases**

This case was not previously before this Court or any other court, except for the district court. Counsel for Appellant is unaware of any other court proceedings involving substantially the same parties and the same or similar issues.

# TABLE OF CONTENTS

**Page**

GLOSSARY ................................................................................................. x

JURISDICTION ........................................................................................... 1

INTRODUCTION ........................................................................................ 1

ISSUES PRESENTED .................................................................................. 3

STATUTORY PROVISIONS ........................................................................ 5

STATEMENT ............................................................................................... 5

I.     FACTUAL BACKGROUND ............................................................... 5

     A.    From 2014 to 2017, the Agency Repeatedly Evaluated Dr. Schacht and Concluded that She Was An "Excellent" Doctor ............ 6

     B.    By Mid-2017, the Anesthesiology Department Was in Crisis Due to Staffing and Morale Problems Caused by Long-Term Mismanagement ..................................................................... 8

     C.    Complaints Against Dr. Schacht in Late 2017 and Early 2018 ........... 9

II.    PROCEDURAL HISTORY ......................................................... 16

     A.    Administrative Proceedings ................................................ 16

     B.    District Court Proceedings .................................................. 20

          1.    *The district court's first summary judgment opinion.* .............. 21

          2.    *The Board's post-remand explanation.* ................................... 22

          3.    *The district court's second summary judgment opinion.* .......... 22

SUMMARY OF ARGUMENT ............................................................. 25

ARGUMENT ....................................................................................... 28

I.     THE BOARD ARBITRARILY AND CAPRICIOUSLY EXCLUDED DR. SCHACT'S EVIDENCE ........................................................ 28

A.   It Was Arbitrary And Capricious For The Board To Summarily Exclude Dr. Schacht's Evidence Without Providing A Reason ......... 29

B.   Even if The Court Could Consider the Agency's Post Hoc Reasons, Its Exclusion was Still Arbitrary and Capricious ............... 37

C.   The Board's Exclusion of Dr. Schacht's Evidence Was Not Harmless ............................................................................. 42

II.   BECAUSE THE BOARD FAILED TO CONSIDER ALL OF THE PENALTY FACTORS, ITS TERMINATION DECISION IS ARBITRARY AND CAPRICIOUS ............................................. 50

CONCLUSION ........................................................................ 54

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allina Health Servs. v. Sebelius*,
   746 F.3d 1102 (D.C. Cir. 2014) ...................................................................30

*Alpharma, Inc. v. Leavitt*,
   460 F.3d 1 (D.C. Cir. 2006) ..........................................................23, 31, 33

*Am. Textile Mfrs. Inst., Inc. v. Donovan*,
   452 U.S. 490 (1981) .......................................................................................31

*Am. Wild Horse Pres. Campaign v. Perdue*,
   873 F.3d 914 (D.C. Cir. 2017) ...............................................................28, 41

*Amerijet Int'l, Inc. v. Pistole*,
   753 F.3d 1343 (D.C. Cir. 2014) ..............................................................52, 53

*Atlas Copco, Inc. v. EPA*,
   642 F.2d 458 (D.C. Cir. 1979) ................................................................30, 36

*Bamford v. FCC*,
   535 F.2d 78 (D.C. Cir. 1976) ..................................................................39, 40

*\*Bhd. of Locomotive Eng'rs & Trainmen v. Fed. R.R. Admin.*,
   972 F.3d 83 (D.C. Cir. 2020) .........................................................30, 33, 40

*Bowen v. Am. Hosp. Ass'n*,
   476 U.S. 610 (1986) .......................................................................................34

*Brown v. Davenport*,
   142 S. Ct. 1510 (2022) ...................................................................................32

*Butte, Cnty., Cal. v. Hogen*,
   613 F.3d 190 (D.C. Cir. 2010) .....................................................................52

*Cellular Mobile Sys. of Pa., Inc. v. FCC*,
   782 F.2d 182 (D.C. Cir. 1985) .....................................................................36

Authorities upon which we chiefly rely are marked with asterisks.

*Chevron, U.S.A., Inc. v. Nat'l Res. Def. Council, Inc.*,
467 U.S. 837 (1984) .................................................36

*Christopher v. SmithKline Beecham Corp.*,
567 U.S. 142 (2012) .................................................34

*Colo. Interstate Gas Co. v. FERC*,
850 F.2d 769 (D.C. Cir. 1988) ..............................42

*Commc'ns & Control, Inc. v. FCC*,
374 F.3d 1329 (D.C. Cir. 2004) .......................40, 42

*Dep't of Homeland Security v. Regents of Univ. of Cal.*,
140 S. Ct. 1891 (2020) ................. 1, 4, 23, 24, 29, 30, 31, 32, 33, 34, 35, 36, 37

*Doran v. Wilkie*,
768 F. App'x 340 (6th Cir. 2019) ........................52

*Douglas v. Veterans Administration*,
5 M.S.P.R. 280 (M.S.P.B. 1981) .............16, 20, 50, 51, 52

*Dubnow v. McDonough*,
30 F.4th 603 (7th Cir. 2022) ................................28

*Encino Motorcars, LLC v. Navarro*,
579 U.S. 211 (2016) .................................................42

*Envirocare of Utah, Inc. v. Nuclear Regulatory Comm'n*,
194 F.3d 72 (D.C. Cir. 1999) ..............................42

*Honeywell Int'l, Inc. v. EPA*,
372 F.3d 441 (D.C. Cir. 2004) ..............................36

*Jicarilla Apache Nation v. U.S. Dep't of Interior*,
613 F.3d 1112 (D.C. Cir. 2010) ......................29, 43, 51

*Kisor v. Wilkie*,
139 S. Ct. 2400 (2019) .......................................36, 40

*Kotteakos v. United States*,
328 U.S. 750 (1946)..........................................................44

*Manin v. NTSB*,
627 F.3d 1239 (D.C. Cir. 2011)..............................43, 51

*Michigan v. EPA*,
576 U.S. 743 (2015)..............................4, 30, 31, 32, 34

*Morall v. DEA*,
412 F.3d 165 (D.C. Cir. 2005)......................................30

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*,
463 U.S. 29 (1983)........................................................53

*Nat'l Cable & Telecomms. Ass'n. v. FCC*,
567 F.3d 659 (D.C. Cir. 2009)......................................41

*NLRB v. Wyman-Gordon Co.*,
394 U.S. 759 (1969)......................................................37

*Pension Benefit Guar. Corp. v. LTV Corp.*,
496 U.S. 633 (1990)................................................32, 33

*Purifoy v. Dep't of Veteran's Affairs*,
838 F.3d 1367 (Fed. Cir. 2016) ...................................52

*Reiter v. Sonotone Corp.*,
442 U.S. 330 (1979)......................................................32

*Salzer v. FCC*,
778 F.2d 869 (D.C. Cir. 1985).....................................40

*Sea "B" Mining Co. v. Addison*,
831 F.3d 244 (4th Cir. 2016) .......................................44

*SEC v. Chenery Corp.*,
318 U.S. 80 (1943)..................................................34, 35

*SEC v. Chenery Corp.*,
332 U.S. 194 (1947)...................................................................31, 33

*Shinseki v. Sanders*,
556 U.S. 396 (2009)...........................................................................43

*Sloan v. Dep't of Hous. & Urban Dev.*,
231 F.3d 10 (D.C. Cir. 2000)............................................................53

*\*SNR Wireless LicenseCo, LLC v. FCC*,
868 F.3d 1021 (D.C. Cir. 2017)...........................................39, 40, 41

*Spiva v. Astrue*,
628 F.3d 346 (7th Cir. 2010) .......................................................43, 51

*Sprint Commc'ns Co., v. APCC Servs., Inc.*,
554 U.S. 269 ...................................................................................37

*St. Regis Paper Co. v. United States*,
368 U.S. 208 (1961)...........................................................................37

*Tourus Records, Inc. v. DEA*,
259 F.3d 731 (D.C. Cir. 2001)..........................................................52

*Trinity Broad. Of Fla., Inc. v. FCC*,
211 F.3d 618 (D.C. Cir. 2000)..........................................................39

*United Airlines, Inc. v. Transp. Sec. Admin.*,
20 F.4th 57 (D.C. Cir. 2021).............................................................52

*Vermont Yankee Nuclear Power Corp. v. NRDC*,
435 U.S. 519 (1978)...........................................................................36

*\*Westar Energy, Inc. v. FERC*,
473 F.3d 1239 (D.C. Cir. 2007)...................................................42, 43

*Williams Gas Processing-Gulf Coast Co. v. FERC*,
475 F.3d 319 (D.C. Cir. 2006)..........................................................41

# TABLE OF AUTHORITIES—Continued

**Page(s)**

**Statutes**

28 U.S.C. § 1291 ...................................................................................1

28 U.S.C. § 1331 ...................................................................................1

38 U.S.C. § 7462(f)(2) ...............................................................1, 5, 20, 28

**Other Authorities**

Attorney General's Manual on the Administrative Procedure Act 14
 (1947) ...........................................................................................36

Fed. R. Evid. 401 .................................................................................38

VA Handbook 5013/11,
 https://perma.cc/NB7P-QQ6X ...........................................................10

# GLOSSARY

The agency                   The Department of Veterans Affairs

The Board                    The Disciplinary Appeals Board

Dkt.                         The District Court Docket

JA                           Joint Appendix

ICU                          Intensive Care Unit

## JURISDICTION

The district court had jurisdiction under 28 U.S.C. § 1331 and 38 U.S.C. § 7462(f). It issued a final order on August, 11, 2022, JA31-32, and Dr. Schacht timely appealed on August 22, 2022, Dkt. 60. This Court has jurisdiction under 28 U.S.C. § 1291.

## INTRODUCTION

When adjudicating individual rights, agencies must "turn square corners." *Dep't of Homeland Security v. Regents of Univ. of Cal.*, 140 S. Ct. 1891, 1909 (2020) (*Regents*). The Department of Veterans Affairs (the "agency") sought to terminate Appellant Elizabeth Schacht, M.D., alleging professional misconduct.[1] To defend herself against those potentially career-altering charges, Dr. Schacht submitted detailed evidence for use in an evidentiary hearing before the agency's Disciplinary Appeals Board (the "Board"). That evidence was directly relevant both to the agency's charged misconduct and the appropriate penalty. But instead of considering that evidence or explaining why it would not, the Board summarily excluded it. After a hard-fought hearing, the Board ultimately "validated" Dr. Schacht's medical judgments, though it still concluded that she had committed

---

[1] The agency sought to remove Dr. Schacht from her position as an agency anesthesiologist and to revoke her clinical privileges, which would prevent her from practicing at the hospital. JA160-63. For ease of reference, this brief refers to those adverse actions as "termination."

misconduct based on her "failure to appropriately communicate." JA800-01. And it concluded that termination was the appropriate penalty.

The Board—like all administrative agencies—must explain its decisions. It did not do so here. It failed to provide any contemporaneous reasons when it excluded key pieces of evidence. It also imposed the stiffest possible penalty, without considering whether a less severe punishment would deter future misconduct—even though agency regulations required consideration of that factor. And when almost two years later, the Board finally attempted to provide a reason for excluding Dr. Schacht's evidence, it declared that a vague deadline (that it had routinely ignored) was, in fact, always iron-clad. In short, the Board preferred to rule by fiat, not reason.

The law requires more. The Board must follow its own rules and give notice to the parties. It cannot rationalize arbitrary decisions taken years earlier by coming up with new reasons after the fact. And when it wants to exclude relevant evidence, the Board must explain why—not just point to a vague deadline that, by its own terms, did not apply and was seldom enforced in any event. Because the Board offered only arbitrary conclusions—not reasoned decisions—its order should have been vacated.

The district court erred by allowing the agency to cut corners. To avoid burdening the Board, the district court bent over backwards to give it a "second

chance" to get things right. JA46. But courts aren't responsible for saving administrative bodies from their own mistakes. When an agency gets it wrong, courts vacate so that the agency can consider the problem afresh through a new agency action. That isn't pointless and burdensome formalism—it forces agencies to explain their actions *when they act*, thereby ensuring democratic accountability, and keeping judicial review orderly. Those are important values of administrative law, not inconveniences.

Here, the Board acted arbitrarily. It acted without any reason and then tried to invent new reasons two years after the fact. Even then, it gave arbitrary or nonsensical reasons to justify sweeping Dr. Schacht's evidence under the rug. And it approved a drastic sanction without ever considering if something less severe would serve the agency's interest in deterrence. Those unreasoned and arbitrary actions cannot stand. The Court should reverse the district court's grant of summary judgment, vacate the Board's decision, and remand for the Board to consider the issues afresh.

## ISSUES PRESENTED

This appeal concerns Dr. Schacht's challenge to a decision of the agency removing her from federal service. Prior to a December 2019 evidentiary hearing before the Board, Dr. Schacht submitted hundreds of pages of relevant evidence,

which the Board summarily excluded. The Board then upheld Dr. Schacht's termination without considering that contrary (and mitigating) evidence.

On review, the district court found that the Board acted arbitrarily and capriciously by failing to explain its actions. The district court remanded for the Board to explain itself. And, in October 2021, the Board—for the first time—provided reasons for why it excluded evidence almost two years prior. Based on those newly created justifications, the district court granted summary judgment to the Board.

The issues presented are:

1.    In *Department of Homeland Security v. Regents of University of California*, the Supreme Court clarified the bedrock "procedural requirement that [an agency] provide a reasoned explanation for its action." 140 S. Ct. at 1916. In reviewing whether an agency has satisfied that requirement, a court "is limited to 'the grounds that the agency invoked when it took the action.'" *Id*. at 1907 (quoting *Michigan v. EPA*, 576 U.S. 743, 758 (2015)). While an "agency may elaborate later on [the] reasons (or reasons)" it offered, it "may not provide new ones." *Id*. at 1908. Here, the Board offered no reason whatsoever when it excluded Dr. Schacht's evidence; indeed, the Board never explained those actions at any point during the administrative proceedings. The Board first offered a partial explanation only after

the district court's remand order. Does the Board's 2021 explanation of actions it took in 2019 constitute an "impermissible *post hoc* rationalization" under *Regents*?

2.    Did the Board act arbitrarily and capriciously—and prejudice Dr. Schacht—by refusing to consider relevant evidence?

3.    Did the Board act arbitrarily and capriciously by ordering removal without explaining if an alternative, less-severe sanction would deter similar communication issues?

## STATUTORY PROVISIONS

The relevant statutory provision is 38 U.S.C. § 7462(f)(2) which provides:

> In any case in which judicial review is sought under this subsection, the court shall review the record and hold unlawful and set aside any agency action, finding, or conclusion found to be--
>
> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
>
> (B) obtained without procedures required by law, rule, or regulation having been followed; or
>
> (C) unsupported by substantial evidence.

## STATEMENT

## I.    FACTUAL BACKGROUND

Dr. Elizabeth Schacht has spent most of her adult life training to become a medical doctor. JA261. She is triple board certified in anesthesia, critical care, and advanced perioperative transesophageal echocardiography (a sophisticated imaging technique used in cardiac surgery). JA262. From 2006 to 2010, she worked at

Jackson Memorial Hospital in Miami, Florida—first as an anesthesia resident and then as an attending. JA261. She then completed critical care and cardiac anesthesiology fellowships at Harvard Medical School and the Texas Heart Institute. JA261.

### A. From 2014 to 2017, the Agency Repeatedly Evaluated Dr. Schacht and Concluded that She Was An "Excellent" Doctor

In 2014, Dr. Schacht applied for a position as staff anesthesiologist and critical care doctor at the agency. JA263, JA722-23. She came highly recommended. A cardiac surgeon who had practiced with her for four years ranked her as excellent in every category and recommended her to the agency without reservation. JA263-67. Her fellowship supervisor did the same, noting that she was "an outstanding fellow." JA268-72. And one of her attendings ranked her as an "[e]xcellent [c]ritical [c]are [p]hysician." JA273-77. Given her sterling resume and those rave recommendations, it is little surprise that the agency hired her—first to work at a facility in Florida and then, starting in March 2015, at the agency's Eastern Colorado Healthcare System in Denver, Colorado (the "Hospital"). JA722-23.

For years, the agency—like her prior employers—praised Dr. Schacht. In her first performance evaluation (in October 2015), the director of the Hospital's surgical intensive care unit ("ICU") concluded that Dr. Schacht was "[a]n excellent teacher," took "initiative in quality improvement," and was "[d]oing very well" in her new job. JA355. One of the staff anesthesiologists was even more effusive,

describing Dr. Schacht as "a paragon of skill knowledge and compassion for all." JA356. And the then-chair of anesthesiology summed up his review in just one word: "[e]xcellent." JA358.

The following year brought more of the same. Once again, the then-chair of anesthesiology concluded that Dr. Schacht met the mark on every one of the agency's performance criteria, including its standards for professionalism and interpersonal skills. JA359. The agency reviewed Dr. Schacht again in January 2017, and—after an even more exacting and thorough review—it again found that she satisfied each and every one of the agency's performance criteria.[2] JA362-63. And after yet another evaluation in April 2017, the agency confirmed that Dr. Schacht had satisfied all practice criteria, had no patient complaints, and had "demonstrate[d] interpersonal and communication skills that enable[] [her] to establish and maintain professional relationships with patients, families, and other members of health care teams." JA364-69.

---

[2] The agency typically performed a Focused Professional Practice Evaluation—a more thorough evaluation—shortly after hiring a new doctor. JA834-36. Due to an administrative error, the agency did not properly complete that evaluation when Dr. Schacht was first hired. JA361. After the agency realized its mistake, it tried to remedy its error by initiating a Focused Professional Practice Evaluation process in late 2016. JA361.

**B.     By Mid-2017, the Anesthesiology Department Was in Crisis Due to Staffing and Morale Problems Caused by Long-Term Mismanagement**

By contrast, in 2017, things at the Hospital were anything but excellent.  The anesthesiology department struggled with persistent staffing and morale problems caused by years of mismanagement.  JA493.  Between 2015 and 2018, all four of the other anesthesiologists who worked with Dr. Schacht in the ICU resigned.  JA631-33.  The surgical ICU had three medical directors resign in as many years.  JA630-33.  Other anesthesiology providers likewise resigned or declined offers of employment.  JA449.  That "exodus" caused a full-blown "staffing crisis" that made it impossible "to maintain a physical presence 24x7."  JA450.  Making the staffing situation worse, other anesthesiologists treated the day after they were on call as a "day off," JA442, even though they knew that the agency did not "give days off for post-call."  JA88.

The anesthesiology department had pervasive personnel problems too.  Practitioners reported "hostility among the [nurse anesthesiologists], and a general lack of teamwork within the Department."  JA493.  Doctors and nurses alike refused to work with others in the department.  JA68-76, JA79-87 JA89, JA208-09.  Another anesthesiologist had complaints filed against him by "[j]ust about everyone."  JA639-40.  And, on one occasion, an "irate" male colleague yelled, threatened, and

put his "finger in Dr. Schacht's face" when Dr. Schacht tried to propose a different treatment plan for a critically ill patient. JA431; *see also* JA425-27, JA432.

In July 2017, after yet another anesthesiologist resigned from the surgical ICU, Dr. Schacht met with the Hospital's deputy chief of staff. JA760-61. At the time, Dr. Schacht and one other doctor were handling sixty percent of the call duty for the surgical ICU. JA759-60. Dr. Schacht requested the meeting to discuss how the "staffing issues were not sustainable." JA761. Dr. Schacht also raised her concerns about how certain of her colleagues were "not even present" at the Hospital on days after they were on call. JA766.

In late 2017, the Committee on Veterans Affairs of the U.S. House of Representatives began to investigate the Hospital. *See* JA492-96. It concluded that its anesthesiology department had been mismanaged for years and that doctors had "misuse[d]" post-call days and treated them "as a day off." JA493-94, JA158.

## C. Complaints Against Dr. Schacht in Late 2017 and Early 2018

Shortly thereafter, Hospital administrators began criticizing Dr. Schacht's performance, without raising those concerns to Dr. Schacht. On October 31, 2017, then-chief of anesthesiology Sean Shockey signed a negative performance review, rating Dr. Schacht as "low satisfactory" overall. JA371-72. But Dr. Shockey did not provide his evaluation to Dr. Schacht in October 2017—indeed, he waited five months, emailing that review to her only on March 15, 2018, *after* she had been

suspended.[3] JA767-70. Instead of telling Dr. Schacht about his October evaluation, on November 7, 2017, Dr. Shockey recommended that the agency pay Dr. Schacht a bonus for achieving "[m]ost" of her "performance goal(s)/objective(s)" for 2017. JA375. In doing so, Dr. Shockey did not indicate any serious concerns with Dr. Schacht's performance, even though he did reduce her bonus slightly to account for "resident reviews." JA375.

Dr. Schacht was, therefore, surprised when—in January 2018—she received a letter from the University of Colorado stating that, due to unspecified resident complaints, she could no longer supervise University residents. JA101, JA847-48. However, the residency director (Dr. Anthony Oliva) repeatedly offered that the University was open to a path for Dr. Schacht to "work with residents" again. JA297, *see also* JA847-48 (similar).

---

[3] Pursuant to an agency directive, Dr. Shockey should have told Dr. Schacht about that evaluation "no later than 60 calendar days" after September 30, 2017 (the last day in the rating period). VA Handbook 5013/11 at II-4, https://perma.cc/NB7P-QQ6X ("Directive 5013"); JA371. He also should have promptly scheduled a "counseling conference . . . to inform [Dr. Schacht] of the deficiencies, give [her] a reasonable opportunity to correct identified deficiencies and demonstrate satisfactory performance." Directive 5013 at II-7. None of that happened here.

The district court mistakenly concluded that Directive 5013 "does not apply to physician employees." JA27. But it based on that conclusion on a separate part of the directive—Part I, which excluded "physicians" from a "Title 5 Performance Appraisal Program." Directive 5013 at I-1 (cited by JA27). Part II, by contrast, is expressly designed "to appraise the performance of full-time . . . Physicians." Directive 5013 at II-1.

Shortly after receiving the letter, Dr. Schacht welcomed "constructive feedback" and requested an opportunity to meet with Dr. Oliva to discuss how to "resume [her] role as faculty in the near future." JA101-02. Dr. Schacht—who was in the midst of a high-risk pregnancy—followed up repeatedly over the next few weeks to request a meeting. JA297. Dr. Oliva asked her to be patient given the ongoing "resident recruitment season," but noted that the "focus" of any meeting "will be on pathways to regain your ability to work with residents." JA297. The resident complaints ultimately became Specification Eight in the agency's charge of unprofessional conduct. *See* JA161.[4]

The other incidents underlying the agency's charge all occurred—or only became formal complaints—over a two-week period in January and February 2018.

*The X-Ray Incident.* On January 29, 2018, Dr. Schacht administered anesthesia to a patient before an endoscopic retrograde cholangiopancreatography— a procedure that uses an x-ray-guided scope to treat certain problems in the pancreas. JA648-49. She then left the room to treat other patients. JA649, JA747-48. Roughly three hours later, Dr. Schacht needed to retrieve information from the room for another patient. JA750-51. Thinking that the surgeon would no longer be using x-

_____

[4] The agency handbook requires the agency to support a charge with specifications—i.e., specific incidents upon which the proposed action is based. JA808.

rays because the procedure should be ending, Dr. Schacht entered the room without a lead apron. JA748-50. But radiation was still being used. JA751. That alarmed Dr. Schacht—who had been advised to avoid radiation during her pregnancy. JA751-52. Dr. Schacht responded by telling the gastroenterologist (Dr. Hazem Hammad) to stop using radiation, and she left the room when he made clear that stopping was not possible. JA752.

Dr. Hammad characterized this episode as an odd—but harmless—one-off. He testified that it was odd that Dr. Schacht told him to stop using radiation, rather than merely asking him to stop or telling him that she only needed a minute. JA651-52, JA673-74. But he testified that incident did not affect the outcome for the patient. JA662, JA677. To Dr. Hammad, this was nothing more than a "one-time incident," and he noted that he did not have any communication "issues with Dr. Schacht." JA659, JA668. Moreover, he only wrote up a formal report of that incident a week later, when he was asked to do so. JA661. This incident became Specification Four in the agency's charge. *See* JA160.

*The Misplaced Breathing Tube*. Ten days later—on February 7, 2018—Dr. Schacht and a nurse anesthesiologist, Sarah Fredriksson, prepared a patient for surgery. JA559, JA562-63. Because the patient would be under general anesthesia, nurse Fredriksson placed a breathing tube. JA125. But shortly after the nurse placed the tube, the patient's oxygen levels began "dropping rapidly." JA125, JA734. Dr.

Schacht observed the patient turning blue. JA738. Due to the falling oxygen levels, the fact that the patient's chest was not rising, and the patient's change in color, Dr. Schacht concluded that the tube had been placed incorrectly (in the esophagus instead of the trachea). JA125, JA738-43. She, therefore, removed the tube. JA125, JA741. After the tube was reinserted, the patient's oxygen levels returned to normal, and the surgery proceeded without issue. JA741, JA744.

A misplaced tube can be a matter of life and death. According to Dr. Black, Dr. Schacht's decision to remove and correctly replace the tube could well have been "life-saving." And Dr. Black "applaud[ed] . . . Dr. Schacht [on] reacting" to the patient's condition. JA515-16, JA520.

Nurse Fredriksson nevertheless lodged a complaint. JA125-26. She took issue with Dr. Schacht's actions because, in her view, she placed the tube correctly the first time, notwithstanding all signs to the contrary. JA125, JA562-63. Nurse Fredriksson therefore argued that Dr. Schacht should have waited—and had a discussion with her—before acting to ensure that the patient could breathe. JA125. In short, Ms. Fredriksson said she was upset with Dr. Schacht—the attending anesthesiologist—because Dr. Schacht went "behind my back to do something without even asking me." JA567. This incident became Specification Two in the agency's charge. *See* JA160.

*The Blood Pressure Dispute*.  A few days later, Dr. Schacht had a run-in with a different nurse anesthesiologist, Tim Christie, during a surgery.  JA160.  Their patient had a number of health problems: he was obese, had suffered a stroke only a few weeks earlier, and had a history of methamphetamine abuse.  JA139.  So, when the patient's blood pressure began to spike early in the procedure, Dr. Schacht had ample cause for concern.  JA727, JA731-32.  Dr. Schacht showed the elevated blood-pressure readings to the surgical team and then announced that she was going to place an arterial line, which allows for more accurate (and more frequent) blood-pressure measurements.  JA731.  She placed the line without incident, and the surgery proceeded without issue.  JA555, JA732-33.

After the surgery concluded successfully, Nurse Christie complained to Dr. Black.  JA141-42.  Although Nurse Christie never said one word about Dr. Schacht's proposed course of treatment in the operating room, he told Dr. Black that Dr. Schacht got it all wrong.  JA141-42, JA527-28.  In Mr. Christie's view, a blood-pressure cuff was sufficient, and the anesthesia team should have interrupted to "stop[] the OR staff from moving the patients" and then told everyone to "wait for a few minutes."  JA524, JA527.  And he argued that there were other non-invasive ways that Dr. Schacht could have monitored the patient's blood pressure.  JA550-51, JA555-56.  None of that called Dr. Schacht's clinical judgment into question—indeed, Dr. Black later testified that "there are some medical issues with Mr.

Christie's response to be sure." JA513-14. But because Dr. Schacht acted to resolve the patient issue without first stopping to discuss why the nurse was wrong, the agency said that the incident caused the nurse "not to feel valued as part of the anesthesia team." JA799. This incident became Specification One in the agency's charge. *See* JA160.

*Dr. Schacht's Suspension*. On February 14, 2018, the Hospital "summarily suspended" Dr. Schacht. JA99. Even after Dr. Schacht's suspension, Dr. Black continued soliciting complaints against her. JA608-09. He offered overtime to employees who would stay late to draft such complaints. JA522-23. And when other anesthesia providers declined to file complaints, Dr. Black became "upset" and "dismissed [them] out of the office very quickly and abruptly." JA628-29. A nurse anesthesiologist testified that those efforts to draw out complaints were "inappropriate," and another thought that it was "very possible" that she would be subject to retaliation if she supported Dr. Schacht. JA624, JA627. Unsurprisingly, those strongarm efforts ultimately yielded another complaint against Dr. Schacht.

*A Complaint About Cell-Phone Usage More Than Three Months Earlier*. At Dr. Black's urging, Dr. Bolson submitted a complaint on February 23, 2018 concerning a surgery from early November 2017. JA94, JA608-09. Dr. Bolson claimed that Dr. Schacht had been distracted by her cell phone during the surgery. JA94. She concluded that Dr. Schacht was "not in tune with the case" because Dr.

Schacht supposedly asked Dr. Bolson if she was closing when she was only halfway through the procedure.  JA94.

But Dr. Bolson admitted that the contemporaneous medical records were "at odds" with her memory of the case.  JA604.  For example, Dr. Bolson claimed that Dr. Schacht was present for the entire seventy-five-minute-long operation, but the chart showed that Dr. Schacht only entered the room twenty minutes before the patient left the operating room.  JA590, JA604-05; JA91 (chart).  Dr. Bolson further conceded that other anesthesiologists regularly used their cell phones during surgeries and that they would sometimes ask where she was in a case.  JA601, JA611.  The agency subsequently added this incident to its charge as Specification Five.  *See* JA160.

## II.    PROCEDURAL HISTORY

### A.    Administrative Proceedings

On August 1, 2018, the Hospital's Chief of Staff charged Dr. Schacht with unprofessional conduct, citing eight specifications.  JA160-61.  Agency regulations also required her to consider the twelve penalty factors laid out in *Douglas v. Veterans Administration*, 5 M.S.P.R. 280, 305–06 (M.S.P.B. 1981).  JA813-14.  After weighing those factors, the Chief of Staff concluded that Dr. Schacht should be removed from federal service and her clinical privileges should be revoked.

JA160-61, JA860-63.[5]  The Hospital's Director issued the final agency decision shortly thereafter.  JA165.  The final decision rejected three specifications, but concluded that Dr. Schacht committed misconduct based on the remaining specifications alleging that she failed to "appropriate[ly] communicat[e]" with residents, nurses, and other staff (Nos. 1-2, 4, 8) and was once distracted by her cell phone during a procedure (No. 5).  JA165, JA160-61.

On August 30, 2018, Dr. Schacht timely appealed the agency's decision to the Disciplinary Appeals Board.  JA168.  Before the Board, Dr. Schacht argued that the specifications alleged by the agency lacked factual support.  JA168-205.  And Dr. Schacht contended that the alleged communications failures did not support termination, particularly given her otherwise spotless work history and the ability of a lesser penalty to deter future communications issues.  JA192-204.

On November 29, 2019, Dr. Schacht submitted additional defense evidence for use at the Board's evidentiary hearing.  JA241-42.  That submission included exhibits that directly refuted the agency's allegations of professional misconduct.  For example, an email from Dr. Black—the Chief of Anesthesiology and one of the

---

[5] That decision wrongly claimed that Dr. Schacht had a Focused Professional Practice Evaluation "for cause."  JA861.  That is flat wrong, as the Board later determined.  JA802.  In reality, Dr. Schacht had no disciplinary record and had, until then, received high marks from the Hospital for her work.  *See* JA352-60, JA362-70.

agency's key witnesses—acknowledged that Dr. Schacht qualified for a performance bonus in 2017, but he personally rejected that bonus because it would "undermine[] the argument that she is a substandard performer." JA373-75.

The submission also had exhibits directly relevant to the penalty determination, including overwhelmingly positive performance reviews from past years, glowing letters of recommendation, and evidence that the agency did not terminate another doctor who was repeatedly criticized for communication issues. JA263-283, JA354-60, JA362-70, JA460-64, JA470, JA473-74, JA476, JA486, JA490-91. The agency objected to some—but not all—of that evidence on the ground that it was not relevant to the "charged misconduct." JA497-503.

At the hearing, the Board summarily rejected that evidence, as well as other evidence that had been submitted by the agency on the same day. JA508. It stated that the "motions [to admit those materials] have been denied by the board" and "[n]one of those additional records will be considered." JA508. Dr. Schacht's counsel responded that the Board's decision "excluding her additional evidence" effectively "precluded [her] from presenting evidence in her own defense." JA509. The Chairman of the Board "[n]oted" that objection, without offering any explanation for the Board's decision. JA509. And when Dr. Schacht's counsel later tried to examine witnesses about facts contained in those summarily excluded documents, the Board cut off the questioning, and admonished him that "you're not

allowed to ask him about anything that does not exist in the evidence file." JA720; *see also, e.g.*, JA719 (sustaining agency objection to witness testimony concerning contents of such documents); JA755-56 (striking similar testimony).

The Board upheld the agency's finding of misconduct. JA798. Although the Board found that Dr. Schacht's clinical decisions were "well within [her] right" and "were validated," it concluded that she "fail[ed] to appropriately communicate" and took "actions without including the whole team." JA799-801. For example, on Specification One, the Board acknowledged that Dr. Schacht consulted with the anesthesia coordinator to "validate her concerns" over a high-risk patient. JA799. And the Board did not dispute that Dr. Schacht acted properly to reduce the patient's stroke risk by placing an arterial line. JA799. But the Board faulted Dr. Schacht for "not hav[ing] a direct conversation with [nurse] Timothy Christie causing him not to feel valued," and it credited Mr. Christie's testimony that Dr. Schacht was always "difficult." JA799.

On the penalty determination, the Board again sided with the agency. In reaching that determination, the Board said nothing about the five specifications at issue. JA801-03. Instead, it justified Dr. Schacht's termination based on its conclusion that her "communication style created a toxic environment." JA802; *see also* JA803 ("[T]he environment [Dr. Schacht] created was very toxic."). To support that finding, the Board cited one—but only one—of her performance evaluations

19

(from October 2017), while simultaneously stressing that Dr. Schacht's "communication issues started prior to" late 2017. JA802-03.

And in considering "[t]he adequacy and effectiveness of [an] alternative sanction to deter such conduct in the future," the Board simply stated that it "believes the offense was serious enough to warrant removal from the [agency]." JA803. But, at the same time, the Board made clear that Dr. Schacht is not irredeemable—to the contrary, the Board expressed its "belie[f] [that] she can be hired by another institution with a clean slate" and could have "success in her future employment." JA803.[6]

## B. District Court Proceedings

Dr. Schacht timely sought judicial review in district court under 38 U.S.C. § 7462(f)(2). Dkt. 1. She argued, among other things, that the Board's decision should be vacated because the Board rejected her evidence without providing an explanation and failed to properly apply and weigh the *Douglas* penalty factors. Dkt. 21-2 at 15, 28–40.

---

[6] The agency's decision to revoke Dr. Schacht's clinical privileges triggered a report to the Colorado Medical Board. After review, the Colorado Board dismissed the complaint, concluding that there were insufficient grounds for formal disciplinary proceedings under state law.

*1. The district court's first summary judgment opinion.*

The district court granted partial summary judgment to Dr. Schacht on the evidentiary exclusion. JA18-20. It agreed that the agency's "summary exclusion of [her] additional documentary and impeachment evidence violated established principles of agency adjudication" because the Board "failed to give any reason justifying the exclusion." JA18. And the district court likewise concluded that portions of the excluded evidence "speak to each of the specifications underlying the [agency's] charge," bore on the "penalty factors relating to her past performance," and could have impeached or otherwise "spoken to the credibility of" witnesses that the Board "relied on in sustaining the charge." JA18-19.

While the agency recognized that the Board offered no explanation whatsoever to justify that exclusion, the agency argued that the district court could still deny review. JA19 (summarizing agency position). According to the agency, the Board properly excluded that evidence "because it concerned matters over which the [Board] lacked jurisdiction or was generated in non-[Board] proceedings." JA19. The district court criticized that reasoning, noting that evidence from "proceedings in other jurisdictions" is "routinely admit[ted]" to "demonstrat[e] such things as witness bias and testimonial inconsistency." JA19-20.

But the district court ultimately declined to rule on "the agency's new justifications" because they did not "c[o]me from the [Board]." JA19-20. The

district court therefore remanded for the Board to either "provide an explanation for its decision to exclude [Appellant's] supplemental evidence and the prior sworn testimony here, or reconsider its decision in light of any of the excluded evidence it may now choose to admit." JA28; JA1 (order).

## 2. The Board's post-remand explanation.

On October 25, 2021, the Board responded to the district court's remand by issuing a letter to Dr. Schacht. JA29. In that 2021 letter, the Board created a new explanation for its December 2, 2019 exclusion order. JA29. According to the Board, it excluded that evidence on timeliness grounds because "all exhibits, motions and requests were due to the [Board] for consideration by October 7, 2019." JA29. It claimed that the Board also excluded those materials on relevance grounds because "a review of the documentation [] showed many of the documents were related to a discrimination-related case which was outside the Board's jurisdiction and scope." JA29. Because "the Board does not have jurisdiction over allegations of discrimination," it concluded that "[t]hose documents were not relevant to the case and charges before the [Board] and were therefore excluded." JA29.

## 3. The district court's second summary judgment opinion.

Back in the district court, the parties cross-moved for summary judgment. Dkts. 39, 41. Relying on *Regents*, Dr. Schacht argued that the Board's remand explanation constituted an impermissible *post hoc* rationalization. Dkt. 43 at 7–9.

The agency responded that the no-*post-hoc*-rationalization rule "'does not prohibit [an agency] from submitting an amplified articulation' of the reasons for its decisions following a remand." Dkt. 45 at 5 (quoting *Alpharma, Inc. v. Leavitt*, 460 F.3d 1, 6 (D.C. Cir. 2006)).

The district court sided with the agency, though not "for the [] reasons offered by the agency." JA41. It correctly rejected the agency's reliance on *Alpharma*. That case held that courts can consider *post hoc* rationalizations when they are offered by the "agency itself, not litigation counsel or the court." JA43 (quoting *Alpharma*, 460 F.3d at 6). But that reasoning did not survive *Regents*. As the district court explained, *Regents* held that the rule against *post hoc* rationalizations "'appl[ies] with equal force regardless' of whether the explanations are offered by counsel or the agency itself." JA43 (quoting *Regents*, 140 S. Ct. at 1909).

Instead, the district court created a novel exception to *Regents*, which had not been briefed or argued by either party. Seizing on a single sentence from *Regents*, the district court concluded that the rule *post hoc* rationalizations applies only where "the agency's initial explanation indicate[s] the determinative reason for the final action taken." JA43 (quoting *Regents*, 140 S. Ct. at 1908). Because the agency here "failed to give *any* explanation for the exclusion," the district court concluded that *Regents* does not apply. JA43-44 (emphasis in original). The district court therefore held that it could consider the Board's post-remand explanation. JA43-44.

After considering the Board's post-remand letter, the district court concluded that the Board's *post hoc* rationalization sufficiently justified the Board's decision to exclude Dr. Schacht's supplemental evidence. JA47-54. It reasoned that the Board's Chair had authority to set and enforce the October 7, 2019 deadline for "motions or other requests." JA47-48. The district court acknowledged that "it is not obvious" that a deadline for "other requests" would encompass trial exhibits. JA48. And it recognized that the Chair repeatedly accepted materials that the parties submitted after that deadline. JA49. But it nevertheless upheld the Board's exclusion order because "it was not unreasonable for the [Chair] to interpret the October 7 deadline to cover requests for the admission of exhibits." JA48. And the Chair's "lenience" on some submissions "did not preclude him from later enforcing the schedule order" on others. JA49.[7]

As a backstop, the district court held that the Board's exclusion would "not warrant vacatur," even without the "timeliness explanation." JA50. Because Dr. Schacht had not "established" that such evidence "could have affected the [Board's] outcome," the district court brushed away the exclusion under the harmless-error

---

[7] The district court "remain[ed] unconvinced" by the Board's alternative reason for exclusion—namely, that the evidence was irrelevant because it was collected in proceedings "outside [the Board]'s jurisdiction." JA51. That reasoning makes no sense because, as the district court again explained, "evidence from outside proceedings is generally admissible to demonstrate witness bias, testimonial inconsistency, and the like." JA51.

rule.  JA50.  While the district court noted that portions of the excluded evidence could have been relevant to both the charged misconduct and the penalty factors, it nevertheless concluded that the exclusion was harmless because the Board "heard other evidence on the topic."  JA51.

Finally, the district court upheld the Board's penalty analysis.  JA63-67. Specifically, it stated that the Board "addressed all twelve *Douglas* factors and discussed the relevant evidence in the record."  JA63.  Because it held that the Board's consideration of those factors was not "arbitrary and capricious," the district court upheld "the penalty chosen."  JA67.

Dr. Schacht timely appealed.  Dkt. 60.

## SUMMARY OF ARGUMENT

I.  The Board acted in an arbitrary and capricious fashion by silently and summarily excluding relevant evidence.

A.  It is a bedrock rule of administrative law that agencies must give reasons for their actions.  The Board here excluded a trove of relevant evidence without any explanation.  That error infected the Board's entire decision-making process because, if reasoned decision-making means anything, it means that an agency cannot arbitrarily ignore relevant information.  That is especially true here given that the excluded evidence went directly to hotly disputed issues in both the misconduct and penalty analysis.

The Board's post-remand letter comes almost two years too late. A letter issued years after a decision is undeniably a *post hoc* rationalization. And courts cannot consider *post hoc* rationalizations, regardless of whether they come from lawyers or an agency itself. The district court acknowledged that general rule (and recognized that the Board's explanation was a *post hoc* rationalization), but crafted its own novel exception from whole cloth. According to the district court, an agency that fails to give any reason when it takes an action can give new reasons in response to litigation—even if those reasons come years after the fact.

That new exception would flip administrative law on its head. Agencies that fail to explain their actions should have those actions vacated, not be rewarded with a do-over. The act-now-and-come-up-with-an-explanation-later exception ignores binding precedent and incentivizes even more arbitrary agency action. On that basis alone, the Court should reverse.

B. The Board's *post hoc* rationalization fails in any event. As the district court correctly recognized, the Board's relevance reasoning is nonsensical. But the district court erred in accepting the agency's alternative—and arbitrary—timeliness rationale. The vague scheduling order that the Board relies upon did little to give the parties notice that it set a hard deadline for exhibits. The order does not even use the word "exhibit," much less set an absolute deadline for when they must be submitted. Indeed, prior to Dr. Schacht's submission, both of the parties repeatedly

introduced exhibits after October 7, and the Board repeatedly accepted those exhibits for use at the hearing. So, the natural implication is that October 7 was a deadline for *other* matters (not exhibits), and the Board never adequately notified the parties that it was reading its order differently. But even assuming it applied to exhibits, the Board cannot waive its "deadlines" for some exhibits without explaining why other exhibits should not enjoy the same leniency. It is, therefore, arbitrary and capricious for the Board to suddenly begin relying on that "deadline" to summarily exclude critical evidence.

C. The Board's erroneous exclusions prejudiced Dr. Schacht. Dr. Schacht sought to admit evidence that directly bore on the charged communication issues and on whether such issues justified her termination. As the Board—and the district court—recognized, the parties hotly contested these issues at the hearing. While the Board ultimately decided that the balance tilted in the agency's favor, it made that decision without the benefit of the additional evidence that Dr. Schacht sought to admit. In such a close case, the hard proof that Dr. Schacht proffered could make all the difference—it therefore easily clears the relatively low hurdle of the harmless-error test. The district court erred in concluding otherwise.

II. The Board's removal decision was arbitrary and capricious for an independent reason. The agency's regulations required the Board to consider various factors when considering whether removal was an appropriate sanction,

including whether a less severe sanction would suffice to deter similar misconduct. But the Board upheld removal without ever evaluating the sufficiency of a lesser sanction. That failure renders its action arbitrary and capricious, and is an independent reason to reverse.

## ARGUMENT

The Court exercises plenary review over a district court's grant of summary judgment. *Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 922 (D.C. Cir. 2017). Section 7462(f)(2) directs courts set aside any agency decisions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." That "mirrors" the standard for reviewing agency decisions under the Administrative Procedure Act. *Dubnow v. McDonough*, 30 F.4th 603, 610 (7th Cir. 2022). In considering whether the agency action was arbitrary and capricious, the Court reviews the record *de novo*. *Jicarilla Apache Nation v. U.S. Dep't of Interior*, 613 F.3d 1112, 1118 (D.C. Cir. 2010)

## I.    THE BOARD ARBITRARILY AND CAPRICIOUSLY EXCLUDED DR. SCHACHT'S EVIDENCE

The Board summarily excluded relevant evidence without explanation. Such unreasoned actions are inherently arbitrary. While the Board tried to justify its actions two years later—after the district court's remand—that is far too late. Courts can only consider reasons that agencies give *when they act*, not after-the-fact explanations crafted in response to litigation. As the Supreme Court has explained,

that bedrock rule of administrative law keeps agencies honest, promotes accountability, and protects individual rights. *Regents*, 140 S. Ct. at 1908-1909. Because the Board acted without any reason, the district court's only option was to vacate so that the Board could take a new action. But even if courts could consider *post hoc* rationalizations, the Board's newly crafted reasons would still be arbitrary and capricious. And that error was not harmless; the Board relied on its summary exclusion to ignore critical evidence that could have changed its conclusions on hotly contested issues. The district court therefore erred in granting summary judgment.

### A.  It Was Arbitrary And Capricious For The Board To Summarily Exclude Dr. Schacht's Evidence Without Providing A Reason

Administrative law "requires agencies to engage in 'reasoned decisionmaking.'" *Regents*, 140 S. Ct. at 1905 (quoting *Michigan*, 576 U.S. at 750). An agency cannot "ignore[] relevant evidence." *Morall v. DEA*, 412 F.3d 165, 178 (D.C. Cir. 2005). Nor can an agency use "blanket evidentiary exclusion[s]" to "arbitrarily limit" the scope of hearings without providing a sufficient justification. *Atlas Copco, Inc. v. EPA*, 642 F.2d 458, 467 (D.C. Cir. 1979). When an agency fails to explain its actions, "[v]acatur 'is the normal remedy.'" *Bhd. of Locomotive Eng'rs & Trainmen v. Fed. R.R. Admin.*, 972 F.3d 83, 117 (D.C. Cir. 2020) (quoting *Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1110 (D.C. Cir. 2014)).

Here, the Board failed to comply with that basic duty. The district court correctly found—and "[t]he agency [did] not contest"—that the Board "offered no

reason for the exclusion of [Dr. Schacht's] supplemental evidence." JA19. "There is no reason—not one word—in the administrative record for the [Board's] material and consequential decisionmaking on [that] important matter[]." *Locomotive Eng'rs*, 972 F.3d at 117. Because the Board failed to supply any reason at all when it made its decision, the Board's action "may not be sustained." *Id.* The district court, therefore, should have vacated so that the Board could "'deal with the problem afresh' by taking *new* agency action." *Regents*, 140 S. Ct. 1908 (quoting *SEC v. Chenery Corp.*, 332 U.S. 194, 201 (1947) (*Chenery II*)).

The Board's post-remand explanation changes nothing. "It is a 'foundational principle of administrative law' that judicial review of agency action is limited to 'the grounds that the agency invoked *when it took the action*.'" *Regents*, 140 S. Ct. at 1907 (quoting *Michigan*, 576 U.S. at 758) (emphasis added). "[T]he *post hoc* rationalizations of the agency . . . cannot serve as a sufficient predicate for agency action." *Id.* at 1909 (quoting *Am. Textile Mfrs. Inst., Inc. v. Donovan*, 452 U.S. 490, 539 (1981)). And, of course, the Board's 2021 letter in response to the district court's remand "would have to be 'post hoc' as measured against [a Board] decision issued in [2019]." *Alpharma,* 460 F.3d at 6.

Not so fast, said the district court. Acting without the benefit of briefing, the district court invented its own exception to that rule. The district court based that exception on a single on a single sentence in *Regents*: "When an agency's initial

30

explanation indicate[s] the determinative reason for the final action taken, the agency may elaborate later on that reason (or reasons) but may not provide new ones." JA43 (quoting *Regents*, 140 S. Ct. at 1908). Because the Board here "failed to give *any* explanation" when it took its original action, the district court reasoned that the "rule announced in *Regents* . . . does not apply," and it was free to consider the Board's *post hoc* rationalization. JA43-44.

That reasoning is a textbook example of why "the language of an opinion is not always to be parsed as though we were dealing with the language of a statute." *Brown v. Davenport*, 142 S. Ct. 1510, 1528 (2022) (quoting *Reiter v. Sonotone Corp.*, 442 U.S. 330, 341 (1979)) (alteration adopted). The *single* sentence that the district court relied upon came in the middle of a paragraph that began: "It is a 'foundational principle of administrative law' that judicial review of agency action is limited to 'the grounds that the agency invoked *when it took the action*.'" *Regents*, 140 S. Ct. at 1907 (quoting *Michigan*, 576 U.S. at 758) (emphasis added). Underscoring that point, the Supreme Court explained that "[i]f *those* grounds are inadequate, a court may remand for the agency" to "offer 'a fuller explanation of [its] reasoning *at the time of the agency action*.'" *Id*. (quoting *Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 654 (1990)) (first emphasis added). But the Supreme Court stressed that the remand "route has important limitations" because an agency can only "elaborate" on its earlier reasons—it "may not provide new

ones." *Id*. at 1908. Read in context, it is therefore clear that the sentence that the district court relied upon is discussing *limits* to the agency's power to "offer a fuller explanation" of the grounds that it "invoked when it took the action." *Id*. at 1907-08 (quoting *Pension Benefit Guar. Corp.*, 496 U.S. at 654 then quoting *Michigan*, 576 U.S. at 758). It is not a loophole to the general rule against *post hoc* rationalizations.

The "basic rule" in *Regents* is "clear." *Id.* at 1909. "An agency must defend its actions based on the reasons it gave *when it acted*." *Id.* (emphasis added).[8] *Regents* mandates that courts look to an agency's "contemporaneous explanations." *Id.* And the Court repeatedly stressed that it prohibits "*post hoc* rationalizations, not advocate rationalizations, because the problem is the timing, not the speaker." *Id.* Put differently, courts cannot consider new reasons for old agency actions under any circumstances—it does not matter whether the agency gave a reason in the first instance. When an agency fails to provide an adequate explanation when it acts, courts don't give it another shot to justify those long-ago actions; instead, they vacate

---

[8] To be sure, *Regents* permits an agency to give a "fuller explanation" of the reasons it gave "*at the time of the agency action*." 140 S. Ct. at 1907 (quoting *Pension Benefit Guar. Corp.*, 496 U.S. at 654). But that truism is irrelevant here. The Board gave no reason for its decision in 2019. JA6, JA19; JA508-09. Given that "total explanatory void," *Locomotive Eng'rs*, 972 F.3d at 117, there was nothing for the Board to "amplif[y]" or "elaborate" on, *Regents*, 140 S. Ct. at 1908 (quoting *Alpharma, Inc.*, 460 F.3d at 5–6). Zero multiplied by anything is still zero.

so that the agency can "'deal with the problem afresh' by taking *new* agency action." *Id.* at 1908 (quoting *Chenery II*, 332 U.S. at 201). By focusing on one sentence in isolation, the district court missed the Supreme Court's fundamental point.

The remainder of *Regents* only further confirms that general prohibition on *post hoc* rationalizations. The Supreme Court explained that rule "serves important values of administrative law." *Id.* at 1909. Forcing an agency to defend its actions based on the reasons it gave when it took an action "promotes 'agency accountability' by ensuring that parties . . . can respond fully and in a timely manner to an agency's" action. *Id.* at 1909 (quoting *Bowen v. Am. Hosp. Ass'n*, 476 U.S. 610, 643 (1986)). And it "instills confidence that the reasons given are not simply 'convenient litigating position[s].'" *Id.* (quoting *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 155 (2012)). On the other hand, allowing agencies to provide new reasons after remand, "can upset 'the orderly functioning of the process of review,' . . . forcing both litigants and courts to chase a moving target." *Id.* (quoting *SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943) (*Chenery I*)). None of those values would be served by a new loophole that allows an agency to create new rationalizations for its decisions, so long as it gave no reasons when it acted.

An agency that acts without explaining itself should be judged more harshly, not less. Where the agency fails to say anything, its "reasons . . . are even less than 'inadequate.' They are non-existent." *Locomotive Engr's*, 972 F.3d at 117. That

silence is a flagrant violation of an agency's duty "to engage in 'reasoned decisionmaking.'" *Regents*, 140 S. Ct. at 1905 (quoting *Michigan*, 576 U.S. at 750). That flaw is more than sufficient reason to vacate the agency's action, not a free pass for the agency to take "convenient litigating position[s]" after the fact. *Id.* at 1909 (quoting *Christopher*, 567 U.S. at 155).

A contrary rule would flip administrative law on its head. It would incentivize agencies to act arbitrarily—offering no reason whatsoever—to maximize the chance of surviving a legal challenge months, or even years, later, far from an "orderly . . . process of review." *Id.* (quoting *Chenery I*, 318 U.S. at 94). Under that rule, agencies facing tough questions will be better off saying nothing, rather than locking themselves into a reason that a court might later reject.

The district court expressed concern that applying *Regents* to an agency hearing would be "unduly burdensome during a lengthy proceeding, upsetting the desired balance between efficiency and justice in every adjudication." JA45.[9] But that gets the rule on adjudications backwards. The "important values of administrative law," 140 S. Ct. at 1909, that support the exclusion of "after-the-fact

---

[9] The district court employed a lengthy analogy to appellate review of a district court's evidentiary rulings. JA45-46. But, as the district court recognized, courts cannot affirm based on reasons the Board could have given—only the reasons it actually gave. JA46. The fact that Article III courts can *sometimes* make unexplained evidentiary rulings without being reversed has no bearing on whether administrative agencies can do the same. *E.g.*, *Chenery I*, 318 U.S. at 88.

agency explanation[s]" apply with at least as much force in agency adjudications, *id.* at 1934 (Kavanaugh, J., concurring in part and dissenting in part) (agreeing that those values justify the rule against *post hoc* rationalizations in adjudications). That is because adjudications are "'concerned with the determination of past and present rights and liabilities,' and implicate the due process interests of the individual parties to the adjudication." *Id.* at 1934 (Kavanaugh, J., concurring in part and dissenting in part) (quoting Attorney General's Manual on the Administrative Procedure Act 14 (1947)). "Judicial review of an adjudication therefore ordinarily focuses on what happened *during the agency's adjudication process*"—not explanations contrived years later. *Id.* at 1934-35 (Kavanaugh, J., concurring in part and dissenting in part) (emphasis added).

It is not overly burdensome to ask the Board to explain its actions, particularly when those actions touch directly on individual rights.[10] As the district court correctly noted, any explanation "need not be extensive." JA20 (citing authorities).

---

[10] Other than needing to explain their actions, agencies get broad leeway to run hearings as they see fit. *See Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 525 (1978). They can ignore the rules of evidence. *Honeywell Int'l, Inc. v. EPA*, 372 F.3d 441, 447 (D.C. Cir. 2004). They can hold "paper hearings" and need not permit cross examination. *See Cellular Mobile Sys. of Pa., Inc. v. FCC*, 782 F.2d 182, 198 (D.C. Cir. 1985). And courts defer both to their findings and their reasonable interpretations of statutes and regulations. *Kisor v. Wilkie*, 139 S. Ct. 2400, 2408 (2019); *Chevron, U.S.A., Inc. v. Nat'l Res. Def. Council, Inc.*, 467 U.S. 837, 842–43 (1984). Given the extraordinary powers that agencies yield, asking them for a reason is not asking too much. *Regents*, 140 S. Ct. at 1908-1910.

But administrative law requires the agency to say *something* before excluding relevant materials. *See Atlas Copco*, 642 F.2d at 467. It likely will be relatively simple for the Board to comply with that obligation in ruling on most evidentiary issues—perhaps even a word or two could suffice (e.g., "irrelevant" or "unduly prejudicial"). And "the ease with which [the Board] can comply with [those] requirements . . . is not a reason to abandon our precedents; it is a reason to adhere to them." *Sprint Commc'ns Co., v. APCC Servs., Inc.*, 554 U.S. 269, 305 (Roberts, C.J., dissenting).

Nor is it too "harsh" to require the Board to take a new action given its failure to explain itself years ago. It is easy to dismiss such procedural requirements as "idle and useless formality." *Regents*, 140 S. Ct. at 1909 (quoting *NLRB v. Wyman-Gordon Co.*, 394 U.S. 759, 766, n.6 (1969)). But those rules serve important values and promote agency accountability. *Id*. Particularly when rights are at stake, "'the Government should turn square corners in dealing with the people.'" *Id.* (quoting *St. Regis Paper Co. v. United States*, 368 U.S. 208, 299 (1961) (Black, J., dissenting)). Requiring that an agency give reasons when it acts—not after—is a small price to ensure that agencies do not cut corners when dealing with citizens.[11]

---

[11] The harmless-error rule is inapplicable because this exclusion prejudiced Dr. Schacht for the reasons explained, *infra* Section I.C.

## B. Even if The Court Could Consider the Agency's Post Hoc Reasons, Its Exclusion was Still Arbitrary and Capricious

Even if this Court were to consider the new reasons offered by the Board in its 2021 post-remand letter, its exclusion order would still be arbitrary and capricious. The Board offered two reasons for excluding the evidence file—relevance and timeliness. Neither rationale can withstand even the modest scrutiny of arbitrary-and-capricious review.

*Relevance.* The Board incorrectly equated relevance with jurisdiction. Starting from the premise that many of the proffered materials related to a matter "outside the Board's jurisdiction and scope," the Board concluded that those materials "were not relevant to the case and charges before the [Board]." JA29. That reasoning is nonsensical. Dr. Schacht gathered evidence in connection with Merit Systems Protection Board proceedings concerning the *same underlying events*. The fact that the Board lacked jurisdiction over those other claims does not automatically render all of that factual evidence irrelevant. To the contrary, the agency's own handbook defines evidence as relevant so long as it "relates to" the charge, without limitation on the sources from which such evidence can be gathered. JA833; *see also, e.g.*, Fed. R. Evid. 401 (relevant if "any tendency to make a fact more or less probable"). The district court therefore correctly found that rationale "unconvinc[ing]" even under the deferential standard of arbitrary-and-capricious review. JA51.

*Timeliness*.  The Board's only remaining justification fares no better.  According to the Board, it excluded Dr. Schacht's evidence because "all exhibits, motions and requests were due to the [Board] for consideration by October 7, 2019." JA29.  But that after-the-fact explanation finds little support in the record.  In reality, the Board's scheduling order provided that "pre-hearing motions or other requests" must be received by October 7, 2019—it said not one word about a deadline for exhibits.  JA211.  To the contrary, the scheduling order specifically noted that "*[a]t this hearing* both parties will have the opportunity to present their cases through . . . the introduction of evidence."  JA211 (emphasis added).  As if that were not clear enough, the agency's handbook also provides that: "At the conclusion of the hearing, the Chairperson will close the record," unless the Chair "authorizes parties to submit . . . documents identified for introduction into evidence."  JA832.  The parties, therefore, had little reason to read the scheduling order as setting a firm deadline for exhibits nearly two months *prior* to the start of the hearing—before the parties had even finalized their witness lists.  JA211, JA234.

"It is a basic principle of administrative law that an agency cannot sanction an individual for violating the agency's rules unless the individual had 'fair notice' of the rules."  *SNR Wireless LicenseCo, LLC v. FCC*, 868 F.3d 1021, 1043 (D.C. Cir. 2017).  Notice is only fair if it allows individuals to "identify, with ascertainable certainty, the standards with which the agency expects them to conform."  *Id.*

(quoting *Trinity Broad. Of Fla., Inc. v. FCC*, 211 F.3d 618, 628 (D.C. Cir. 2000)) (alteration adopted); *see also Bamford v. FCC*, 535 F.2d 78, 82 (D.C. Cir. 1976) ("[E]lementary fairness requires clarity of standards sufficient to apprise [a party] of what is expected."). When an agency proceeds "without consideration on the merits," it cannot "proclaim" its rules "on the fly." *Commc'ns & Control, Inc. v. FCC*, 374 F.3d 1329, 1336 (D.C. Cir. 2004) (quoting *Salzer v. FCC*, 778 F.2d 869, 871 (D.C. Cir. 1985)).

Judged against that standard, the Board's order is nowhere close. Its vague reference to "other requests" did nothing to "apprise" Dr. Schacht that exhibits submitted after October 7, 2019 would be summarily excluded. *Bamford*, 535 F.2d at 82. Indeed, even though the agency objected to some of Dr. Schacht's supplemental evidence, it never once mentioned a timeliness problem. JA238-39. And the agency itself submitted several exhibits on the *same day* that Dr. Schacht submitted her supplemental evidence. JA238-39. The fact that neither Dr. Schacht nor the agency itself understood the Board's order as setting an exhibit deadline is powerful evidence of a notice problem. Even if the Board could interpret "other requests" to include exhibits, it cannot do so silently. Because the Board did not provide fair notice, its belated resort to timeliness cannot sustain its exclusion order. *See SNR Wireless* 868 F.3d at 1043; *Commc'ns & Control*, 374 F.3d at 1336.

The district court concluded that it was "not unreasonable" for the Board to interpret the reference to "other requests" in its order as including the admission of evidence. JA48. But that answers the wrong question. The issue is not whether the Board's interpretation of its order could pass muster under *Kisor v. Wilkie*, 139 S. Ct. 2400 (2019) or whether "other requests" *could* be interpreted to include exhibits. The question is whether the Board gave Dr. Schacht "fair notice" of its strict-deadline-for-exhibits interpretation before it sanctioned her for violating that supposed rule. *SNR Wireless,* 868 F.3d at 1043. For the reasons set forth above, it does not.

Making matters worse, the Board here did not interpret its order as setting anything close to a firm deadline for motions or anything else. The Board granted a motion submitted after the October 7 deadline. JA225. It accepted exhibits submitted weeks after that deadline. JA223. And the Board accepted new witness lists that were submitted months after the relevant deadline. JA227-30, JA234-38. Notwithstanding that pattern of accepting late filings, the district court concluded that the Board's "lenience did not preclude [it] from later enforcing the scheduling order." JA49.

That conclusion runs headlong into this Court's precedent. "[I]t is axiomatic that agency action must either be consistent with prior action or offer a reasoned basis for its departure from precedent." *Nat'l Cable & Telecomms. Ass'n. v. FCC,*

567 F.3d 659, 667 (D.C. Cir. 2009) (quoting *Williams Gas Processing-Gulf Coast Co. v. FERC*, 475 F.3d 319, 326 (D.C. Cir. 2006)); *see also Am. Wild Horse Pres. Campaign*, 873 F.3d at 923. Therefore, "[i]f the agency makes an exception in one case, then it must either make an exception in a similar case or point to a relevant distinction between the two cases." *Westar Energy, Inc. v. FERC*, 473 F.3d 1239, 1241 (D.C. Cir. 2007).[12]

The Board did neither. In its post-remand letter, it simply declared that "*all* exhibits, motions and requests were due to the [Board] for consideration by October 7, 2019." JA29 (emphasis added). The record demonstrates otherwise. And the Board's complete failure to distinguish between the cases where it demonstrated "lenience" and those where it brought down the hammer "seems the quintessence of arbitrariness and caprice." *Westar Energy*, 473 F.3d at 1241 (quoting *Colo. Interstate Gas Co. v. FERC*, 850 F.2d 769, 774 (D.C. Cir. 1988)).

The district court speculated about what the Board "likely believed" in allowing some late filings but rejecting others. JA49. Reading between the lines, it hypothesized that the Board may have silently decided that the parties could only "narrow—rather than expand—the scope of the evidence" after November 1. JA49.

---

[12] In other words, an agency "may require an applicant to bear the full cost of its own mistake," but "it ha[s] to explain why it imposed" a rule in one instance while "allowing others to bear no cost." *Commc'ns & Control*, 374 F.3d at 1336.

But "[i]t is not the role of the courts to speculate on reasons that might have supported an agency decision." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 224 (2016). The Board itself provided no distinctions for when it waived and when it enforced its supposed October 7 deadline. Its exclusion order therefore falls well short of what *Westar* requires.

## C. The Board's Exclusion of Dr. Schacht's Evidence Was Not Harmless

Once the court has identified that an agency has acted unlawfully, it can uphold the action, only "when 'there *is not the slightest uncertainty* as to the outcome of a proceeding' on remand." *Manin v. NTSB*, 627 F.3d 1239, 1243 n.1 (D.C. Cir. 2011) (quoting *Envirocare of Utah, Inc. v. Nuclear Regulatory Comm'n*, 194 F.3d 72, 79 (D.C. Cir. 1999)) (emphasis added) (alteration adopted). "[T]he fact that the [agency] . . . might have reached the same result does not prove that [its] failure to consider the evidence was harmless." *Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010). While the party challenging agency action bears the burden of showing prejudice, "the harmless error rule is 'not . . . a particularly onerous requirement.'" *Jicarilla Apache Nation*, 613 F.3d at 1121 (quoting *Shinseki v. Sanders*, 556 U.S. 396, 410 (2009)).

Dr. Schacht easily carries that modest burden. The evidence that she sought to admit spoke directly to both the charged misconduct and the appropriate penalty. True, the district court found that there was *other* evidence in the record that

supported Dr. Schacht's position on these points—some of which the Board "credited" and others of which it did not. *See* JA51-52; *see also* JA56-63 (noting numerous other instances in which the Board considered conflicting evidence). But the fact that the record contained substantial conflicting evidence for the Board to consider does not dissipate the prejudice—it increases it. Where (as here) the record before the Board was "otherwise comprised of contradictory evidence," "prejudice is a natural effect" of excluding evidence that would have "contradicted" the Board's conclusions. *Sea "B" Mining Co. v. Addison*, 831 F.3d 244, 254-55 (4th Cir. 2016) (vacating agency action where administrative law judge excluded medical scans that undermined his other findings). The Supreme Court likewise long ago recognized that an error is not harmless if it tilts the weight of evidence in one party's favor when the "scales otherwise [might be] level." *Kotteakos v. United States*, 328 U.S. 750, 763 (1946). Summarily excluding critical evidence in a hotly contested case like this one is, therefore, anything but harmless.

Notwithstanding those facts, the district court brushed aside this evidence because it "concerned [Dr. Schacht]'s work before the relevant time period or [was] disconnected from the specific incidents at issue in the hearing." JA50. But that misses the point. When considering the charged misconduct, the Board made sweeping findings—well outside the dates of any of the specifications—about how Dr. Schacht "always" had communication problems. And in assessing the

appropriate penalty, the Board likewise considered Dr. Schacht's entire history at the agency, including her "work record" and any "past disciplinary record." JA802. Because the Board did not rest its findings on just one "time period" or the "specific incidents" in the agency charge, JA50, the district court erred in concluding that only exclusions on those limited topics could have prejudiced Dr. Schacht. As shown below, the Board could well have reached different conclusions if it considered all of the evidence. Thus, its exclusion error was not harmless.

*Misconduct*. While the Board ultimately upheld a single charge based on Dr. Schacht's supposed "failure to appropriately communicate," JA801, it easily could have reached a different conclusion. The four specifications related to patients were littered with contradictory evidence. For Specification One (the blood pressure dispute), the agency alleged that Dr. Schacht acted "without appropriate evaluation and assessment" and "without appropriate communication with other staff." JA799. But the Board ultimately concluded that Dr. Schacht did, in fact, "validate her concerns" and made "everyone in the room . . . aware of the patient's condition." JA799. And for Specification Two (the breathing tube), the Board heard testimony that Dr. Schacht's quick action was potentially "life-saving," JA515-16, and it ultimately "validated" her efforts, JA800. Dr. Hammad—the complainant for Specification Four (the x-ray incident)—only filed a complaint after being asked to do so. JA661. And he characterized that incident as nothing more than a "one-time

incident" that did not harm the patient and did not reflect any larger communication problems. JA668. Similarly, Dr. Bolson only filed a complaint at Dr. Black's urging—some three months after the supposed incident with the cell phone (Specification Five). JA94. And Dr. Bolson admitted that her memory was both spotty and contradicted by the medical records from the time of the surgery. JA590, JA604-05; *see also* JA91.

In upholding the charge, the Board put substantial weight on testimony describing long-running problems with Dr. Schacht. Throughout its decision, the Board repeatedly relied on testimony that Dr. Schacht "was *always* very difficult," and had "*always* been somewhat abrasive and [] sometimes hostile." JA799-800 (emphasis added) (testimony about complaints regarding Dr. Schacht's "inability to communicate and to have a discussion and be collegial"); *see also* JA800 (crediting another provider's testimony that it "seems always there was tension when working with" Dr. Schacht). And the Board likewise substantiated claims that Dr. Schacht had a years-long history of significant problems with the "vast majority of residents" dating back to at least May 2016. JA801.

But the evidence that Dr. Schacht sought to admit directly contradicted those findings. Contrary to the testimony that the Board credited, the excluded evidence would have shown that there was no long history of interpersonal problems. The agency's own repeated evaluations of Dr. Schacht in 2015, 2016, and 2017 showed

that she was an "[e]xcellent" doctor who was "[d]oing very well" at the agency. JA355, JA358. Far from showing interpersonal problems, those evaluations— including a thorough and searching Focused Professional Practice Evaluation— confirmed that Dr. Schacht was meeting *all* of the agency's performance criteria in those years, including its criteria concerning communication and interpersonal relations. JA327, JA359, JA362, JA366. The excluded evidence likewise contained rave reviews from prior colleagues and supervisors, who praised Dr. Schacht's communication skills. JA263-83. And it even contained resident reviews from as late as August 2017, which ranked her interpersonal skills as "[e]xceed[ing] [e]xpectations." JA315. The vast majority of those residents commented positively on her teaching and communication skills. JA288. While a handful of residents had critiques about her communication, an equal number could not think of any area where she might improve. JA288. Had the Board considered—rather than summarily excluding—the evidence, it may well have reached a different conclusion about Dr. Schacht's professionalism.

In addition, other portions of that evidence went to the credibility of critical witnesses. For example, the Board relied heavily on Dr. Black's testimony. *See* JA799-801 (repeatedly citing his testimony). Yet, the excluded evidence calls his credibility into question. Specifically, it would have shown that, in November 2017, Dr. Shockey recommended that Dr. Schacht receive a performance bonus because

46

she had met most of her performance metrics for 2017.  JA375.  But months later—after Dr. Black had become chief of anesthesiology—Dr. Black reversed course and recommended that Dr. Schacht receive nothing based on her performance in 2017.  JA376.  In an email, Dr. Black admitted the reason for that abrupt about-face—awarding Dr. Schacht pay-for-performance would have "undermine[d] the argument that she is a substandard performer."  JA374.  These documents paint Dr. Black as someone attempting to craft a narrative—not report the facts.  Had the Board heard this testimony, it may well have decided to take Dr. Black's testimony with a truckload of salt, particularly given that Dr. Black actively encouraged other providers to file complaints against Dr. Schacht.  *See* JA522-23.

*Penalty.*  Dr. Schacht's excluded evidence is even more obviously relevant to the Board's penalty analysis.  In upholding Dr. Schacht's termination, the Board relied heavily on its conclusion that Dr. Schacht's "work record" showed a "consisten[t]" history of "communication issues" that started years earlier.  JA802-03.  And it blamed her personally for the Hospital's dysfunction, finding that Dr. Schacht's "communication style created a toxic environment."  JA802; *see also* JA803 ("the environment [Dr. Schacht] created was very toxic").

The Board reached those findings without ever considering the contradictory evidence that Dr. Schacht sought to admit.  For example, in considering Dr. Schacht's "work record," the Board relied *solely* on a single performance review

from October 2017—which the Hospital only gave to Dr. Schacht after she was suspended, in violation of the agency's own directives. *See* JA802; JA768-70.[13] Based on that single evaluation and testimony from one pharmacist witness, the Board concluded that Dr. Schacht's communication issues started before fall 2017. JA803. But, as a result of its summary exclusion order, the Board never considered the *years* of positive performance evaluations Dr. Schacht sought to admit. *E.g.*, JA352-60, JA362-70. The excluded evaluations would have shown that Dr. Schacht met each and every one of the Hospital's performance metrics in the prior years and even qualified for a performance bonus for 2017. *See* JA352-60, JA362-70, JA375. The pre-2017 reviews contain not one word indicating that Dr. Schacht had poor communication—to the contrary, the Hospital determined that she was an "[e]xcellent" doctor. JA352-60, JA362-70. Had that contrary evidence been admitted, the Board may well have thought differently about whether the communications issues here were so long-running that they warranted the drastic remedy of termination.

Dr. Schacht likewise submitted evidence undercutting the Board's conclusion that she was to blame for the "very toxic environment" at the Hospital. She submitted a report from an investigation from the House Committee for Veterans

---

[13] The Board's action mistakenly lists the date of that evaluation as October 31, 2019, JA802—the actual date was October 31, 2017, JA371-7.

Affairs. JA492-96. In that report, the Committee found that the department was mismanaged with "a general lack of teamwork." JA493. It specifically noted that "[m]any anesthesiologists and [nurse anesthesiologists] claim that there is hostility among the [nurse anesthesiologists]." JA493. And the Committee attributed those problems to an "inefficient" staffing system and years of "mismanagement," not any one individual. JA493. Had the Board had an opportunity to consider that evidence, it likely would not have laid blame for the Hospital's problems at Dr. Schacht's feet.

Moreover, the excluded evidence would have shown that terminating Dr. Schacht was inconsistent with the penalty "imposed upon other employees for the same or similar offenses." *Douglas*, 5 M.S.P.B. at 332. Dr. Schacht sought to admit evidence showing that another doctor had numerous complaints about his communication—including an altercation so severe that the police were called. JA460-64, JA470, JA473-79 (complaints). Yet, the agency only gave that doctor a three-day suspension. Dkt. 21-2 at 34. That short suspension is worlds away from a career-altering termination. Because the Board did not have that evidence, it simply noted that removal is "consistent with the [agency's] non-binding table of penalties." JA802. But that table does not even include an offense (or possible punishment) for "communication issues," and it authorizes a penalty of somewhere between reprimand and removal for nearly all of the offenses it lists. JA815-26. Had the Board considered punishments handed out for those even more egregious

offenses—rather than just referencing a table that says little—its view on this factor might have been different.

*　　*　　*

The Board never considered any of that evidence.  It should be "obvious" that excluding such critical evidence prejudiced Dr. Schacht's defense.  *See Jicarilla Apache Nation*, 613 F.3d at 1121.  Because that evidence is more than enough to have potentially tipped the scale either on misconduct or a lesser penalty, there is at least some uncertainty about the outcome of a remand.  Dr. Schacht, therefore, has met her modest burden of showing that the Board's erroneous exclusion of that evidence was not harmless.  *See Manin*, 627 F.3d at 1243 n.1; *Spiva*, 628 F.3d at 353.

## II.  BECAUSE THE BOARD FAILED TO CONSIDER ALL OF THE PENALTY FACTORS, ITS TERMINATION DECISION IS ARBITRARY AND CAPRICIOUS

The Board's decision upholding Dr. Schacht's removal is arbitrary and capricious for the independent reason that it failed to consider the relevant penalty factors.   In assessing the appropriate penalty, the Board is bound by internal policy to consider the factors set forth in *Douglas*.  JA813-14.  Those factors include "[t]he employee's past disciplinary record;" "[p]otential for the employee's rehabilitation;" and the "adequacy and effectiveness of alternative sanctions to deter such conduct in the future by the employee or others[.]" JA813-14; *Douglas*, 5 M.S.P.B. at 332.

Although, the agency does not have to consider every *Douglas* factor in every case, "[e]ach relevant factor must be addressed." JA813; *see also Purifoy v. Dep't of Veteran's Affairs*, 838 F.3d 1367, 1371–72 (Fed. Cir. 2016) (same); *Doran v. Wilkie*, 768 F. App'x 340, 353 (6th Cir. 2019) (same).

The Board failed to do so here. Its opinion recognized that whether a lesser punishment would sufficiently deter future misconduct would be relevant to its penalty assessment. JA803. But it gave no answer to that question. Instead, the Board's reasoning on that factor reads, in full: "The Board believes the offense was serious enough to warrant removal from the VA." JA803.

Agency analysis need not be extensive, but it must include "reasoning;" "conclusory statements" do not suffice. *Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014) (quoting *Butte, Cnty., Cal. v. Hogen*, 613 F.3d 190, 194 (D.C. Cir. 2010)). At minimum, "the agency must always adequately explain '*why* it chose to do what it did.'" *United Airlines, Inc. v. Transp. Sec. Admin.*, 20 F.4th 57, 64 (D.C. Cir. 2021) (quoting *Tourus Records, Inc. v. DEA*, 259 F.3d 731, 737 (D.C. Cir. 2001)).

The Board's "analysis" on that factor falls short of even that minimal standard. Rather than considering whether a lesser penalty could deter similar misconduct, the Board simply declared the misconduct to be "serious enough" for removal. JA803. But the "nature and seriousness of the offense" is its own factor in the penalty

analysis. JA801. No matter how deferential the review of agency action, courts do not "countenance an agency's failure to 'consider[] . . . relevant factors.'" *Sloan v. Dep't of Hous. & Urban Dev.*, 231 F.3d 10, 15 (D.C. Cir. 2000) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983)). Here, the Board upheld the harshest penalty available—termination—without ever considering if something less extreme could get the job done on deterrence. Thus, its decision "is arbitrary because it says nothing about 'why' [the Board] made the determination" it did on the deterrence question. *Amerijet*, 753 F.3d at 1351–52.

There was also ample evidence that a lesser sanction would have been sufficient here. Upon learning of the resident complaints, Dr. Schacht promptly asked to meet with the residency director to ask how she could "resume [her] role as faculty in the near future," and welcomed "constructive feedback." JA101-02. She followed up on that request repeatedly, JA297, demonstrating her sincere desire to address any issues. And before learning of any of the other complaints against her, Dr. Schacht specifically sought out Dr. Hammad to apologize for the incident involving the use of x-ray radiation. *See* JA666, JA753-54. Dr. Schacht also proactively referred herself to the Colorado Physician Health Program (the "Colorado Program")—a non-profit peer assistance program—to work on improving her communication. JA687-93. One of the doctors from the Colorado Program, Dr. Scott Humphreys, testified that Dr. Schacht was "very motivated" to

"do whatever she can to correct" any communication issues, and that her odds of returning to work without future issue were "extremely high." JA705-06, JA713.

Indeed, even the Board itself concluded that Dr. Schacht could be an effective communicator. JA802-03. Crediting Dr. Humphrey's testimony, the Board found that Dr. Schacht "could be successful" and avoid future problems with communication "if she continues to participate and be monitored in the [Colorado Program]." JA803. While the Board expressed concern that it might be "difficult" for Dr. Schacht to "[re-]integrate" at the Hospital, it did so only after incorrectly concluding that Dr. Schacht was the one who "created" a "very toxic" environment at the Hospital. JA803. As already noted, that conclusion—and the Board's accompanying concern regarding re-integration—may well have been different if the Board had reviewed Dr. Schacht's evidence. *See supra* Section I.C. In any event, the Board's fixation on how some other providers might have felt about a lesser penalty is no substitute for an actual deterrence analysis.

Without ever considering that question, the Board approved the stiffest possible punishment. That failure to consider a relevant factor renders the Board's penalty determination arbitrary. The Court should, therefore, reverse the grant of summary judgment and vacate that decision.

**CONCLUSION**

For the reasons stated herein, the Court should reverse the district court's grant of summary judgment, vacate the Board's exclusion and penalty determinations, and remand for the Board to consider the issues afresh in a new administrative action.

Dated:      April 20, 2023

*/s/ Brandon L. Arnold*

Brandon L. Arnold

Mark H. Russell

KRAMER LEVIN NAFTALIS & FRANKEL LLP

2000 K Street NW, 4th Floor

Washington, DC  20006

Telephone:  202.471.3043

Facsimile:   202.775.4510

Barnold@Kramerlevin.com

*Counsel for Appellant*
*Elizabeth Schacht, M.D.*

## CERTIFICATE OF COMPLIANCE

In accordance with Fed. R. App. P. 32(g)(1) and D.C. Circuit Rule 32(e)(2)(C), I certify that this brief complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because this brief contains 12,465 words, excluding the parts of the motion exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2016, Times New Roman, 14-point font.

/s/ Brandon L. Arnold
Brandon L. Arnold

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system on April 20, 2023. All participants in the case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.

/s/ Brandon L. Arnold
Brandon L. Arnold